IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SOUND RIVERS, INC.,            )
                               )
              Plaintiff,       )
                               )
       v.                      )        1:23-CV-776
                               )
CLAYTON PROPERTIES GROUP,      )
INC., d/b/a Mungo Homes,       )
                               )
              Defendant.       )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This case concerns alleged violations of the Federal Water
Pollution Control Act Amendments of 1972 ("Clean Water Act" or
"the Act"), 33 U.S.C. § 1251 et seq., resulting from a residential
real estate developer's construction activity.  Before the court
is the motion to dismiss by Defendant Clayton Properties Group,
Inc., d/b/a Mungo Homes ("Clayton").  (Doc. 20.)  Plaintiff Sound
Rivers, Inc. ("Sound Rivers") has responded in opposition (Doc.
22), and Clayton has replied (Doc. 23).  For the reasons set forth
below, the motion will be denied.

## I.    BACKGROUND

### 1.    Clean Water Act

The Clean Water Act prohibits "the discharge of any pollutant
by any person," except "as in compliance with [certain provisions
of the Act]."  33 U.S.C. § 1311(a).  "[D]ischarge of a pollutant"
means "any addition of any pollutant to navigable waters from any

point source." Id. § 1362(12)(A). The National Pollutant Discharge Elimination System ("NPDES") authorizes the issuance of permits for the discharge of limited amounts of pollution. Id. § 1342. Permits also impose monitoring, testing, and reporting requirements. Id. § 1318.

Congress has empowered citizens to sue any NPDES permit-holder who has violated an "effluent standard or limitation," subject to standing limitations, a sixty-day notice requirement, and a bar if the Environmental Protection Agency ("EPA") or state is "diligently prosecuting" an enforcement action against the alleged violator. Id. § 1365(a), (b). An effluent standard or limitation includes the conditions of an NPDES permit. Id. § 1365(f)(7). In other words, "[n]oncompliance with a permit constitutes a violation of the Act." Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 174 (2000); see 40 C.F.R. § 122.41(a). A civil penalty may be imposed for every violation, with the proceeds payable to the United States Treasury. 33 U.S.C. § 1319(d). Injunctive relief is also available. Id. § 1319(b) (providing authority to court to "restrain" violations and to "require compliance").

While the EPA may issue NPDES permits, states such as North Carolina have been delegated authority to issue such permits as well. Id. § 1342(b). One such permit that North Carolina issues, pertinent here, is General Permit No. NCG010000 ("General Permit

2

NCG01"). The relevant obligations of this permit are discussed in more detail below.

### 2. The Complaint

The facts alleged in the amended complaint ("the complaint") (Doc. 14), which the court accepts as true for the purpose of Clayton's motion to dismiss, show the following:

Clayton is a Tennessee corporation with its principal place of business in Maryville, Tennessee, and is a subsidiary of Berkshire Hathaway, Inc. (Id. ¶ 19.) It is registered to do business in North Carolina as Mungo Homes. (Id.) Clayton has been developing a site at Sweetbrier in Durham County, North Carolina, since late 2020, where it has allegedly caused or contributed to ongoing sediment pollution in Hurricane Creek, Martin Branch, and other downstream waterways. (Id.)

Sound Rivers is a North Carolina nonprofit membership organization with approximately 2,500 members. (Id. ¶ 13.) It works to "protect, restore, and preserve the Neuse and Tar-Pamlico River Basins through public education, advocacy, and pollution prevention." (Id.) These basins include Falls Lake and tributaries Hurricane Creek, Martin Branch, and Lick Creek. (Id.) Sound Rivers's Neuse Riverkeeper, Samantha Krop, is a member of Sound Rivers who "regularly swims, paddles, camps, and hikes throughout the Neuse River Basin and its tributaries." (Id. ¶ 14.) She "hikes and paddles around Lick Creek less frequently, and her

3

enjoyment of the waterway is affected, due to the sediment pollution she observes from Sweetbrier." (Id.)

Sound Rivers alleges that two other members, Moira Smullen and Steve Smith, have been negatively affected by sediment discharges from Sweetbrier as well. Smullen's home abuts Martin Branch, and the pollution has allegedly diminished her enjoyment of her home and its natural surroundings. (Id. ¶ 16.) Smith will not "swim in or eat fish from Falls Lake due to his concerns about the pollution" and he is "concerned about the quality and safety of his drinking water supply being affected by sediment pollution." (Id.)[1]

Since 2020, Clayton has been engaged in the planning, permitting, and development of Sweetbrier, which consists of two parcels of land in Durham County. (Id. ¶ 51.) Two tributaries to Lick Creek — Hurricane Creek and Martin Branch — flow past the border of Sweetbrier, and Lick Creek then flows into Falls Lake, approximately three stream miles northeast of Sweetbrier. (Id. ¶ 52.)

---

[1] Clayton contests the relevance of Smith's drinking water allegation because it believes his drinking water comes from the City of Raleigh. (Doc. 21 at 12.) Because Smith's standing has no bearing on whether this action may proceed, the court need not address this contention.



(Id.) Falls Lake is the primary drinking water source for the city of Raleigh and other municipalities and is a site for various recreational activities. (Id. ¶ 53.) The North Carolina Department of Environmental Quality ("DEQ") and the United States Army Corps of Engineers have identified multiple streams and wetlands on Sweetbrier as "waters of the United States" under the Clean Water Act. (Id. ¶ 54.)

On February 10, 2022, Clayton obtained authorization to discharge stormwater associated with its construction activities at Sweetbrier under General Permit NCG01, for which Clayton's obligations remain effective as of the date of the amended complaint. (Id. ¶ 56.) Sound Rivers contends that Clayton has

5

violated three obligations imposed by General Permit NCG01, which in turn allegedly amount to violations of sections 301 and 402 of the Clean Water Act. (Id. ¶ 44 (citing 33 U.S.C. § 1365(f)(7)).) These three violations correspond to Sound Rivers's three claims for relief in the complaint. (Id. ¶¶ 82-121.)

First, Sound Rivers alleges that General Permit NCG01 "prohibits discharges of pollutants 'that cause or contribute to violations of North Carolina water quality standards for surface waters or wetlands.'" (Id. ¶ 89 (quoting General Permit NCG01).) Sound Rivers enumerates three standards that Clayton has violated: (1) turbidity, (2) biological integrity, and (3) settleable solids. (Id. ¶¶ 90-104.)[2]

Sound Rivers has conducted its own sampling of Lick Creek, Hurricane Creek, and Martin Branch, as well as Rocky Branch, which flows parallel to Martin Branch to the east but does not abut Sweetbrier. (Id. ¶ 70.)

---

[2] North Carolina's turbidity standard is 50 nephelometric turbidity units ("NTU") for the waters at issue in this case, and if natural background conditions exceed 50 NTU, then the existing turbidity level "shall not be increased." (Id. ¶¶ 39-40 (citing 15A NCAC 02B .0211(21)).) North Carolina's biological integrity standard protects waters from pollution that would preclude "the ability of [the] aquatic ecosystem to support and maintain a balanced and indigenous community of organisms having species composition, diversity, population densities, and functional organization similar to that of reference conditions." (Id. ¶ 96 (quoting 15A NCAC 02B .0202(13)).) North Carolina's settleable solids standard prohibits sewage and industrial or other wastes from "mak[ing] the water unsafe or unsuitable for aquatic life and wildlife or [from] impair[ing] the waters for any designated uses." (Id. ¶ 99 (quoting 15A NCAC 02B .0211(8)).) Other wastes include suspended solids and sediment. N.C. Gen. Stat. § 143-213(18)(c).

6



**Sweetbrier Site Map with Sampling Locations**

Sampling Sites
- Sound Rivers
- Sound Rivers & City of Durham

Hydrography
- Streams
- Flow Direction

Property Boundaries
- Sweetbrier Site
- Other Developments & Proposed Developments

Kemp Rd Confluence
Hurricane Creek
Rocky Branch
Sweetbrier Site
Martin Branch

Map by: Libbie Weimer (lweimer@selcnc.org)
Last updated: September 21, 2023
Sources: City of Durham, Clayton Properties
Group, USGS, NCDOT

Mile

Sound Rivers alleges that it has observed exceedances of North Carolina's turbidity standard, <u>see</u> <u>supra</u> note 2, in Martin Branch during every sample taken since November 2022. On August 31, 2023, the turbidity level exceeded 1,100 NTU, which is the maximum measure Sound Rivers's device could record. (<u>Id.</u> ¶ 71.) Sound Rivers alleges that DEQ's sampling accords with its findings. (<u>Id.</u> ¶¶ 75-76 (alleging 210 NTU at Martin Branch and 450 NTU at Kemp Confluence on January 6, 2023).) While the turbidity standard is "deemed met when land management activities employ Best Management Practices," as defined by 15A NCAC 02B .0202(9), Sound Rivers alleges that Clayton's noncompliance with its erosion and sediment control plan, discussed immediately below, show that best management practices cannot excuse Clayton. (<u>Id.</u> ¶ 95.)

Second, Sound Rivers alleges that General Permit NCG01 imposes several obligations for erosion and sediment control.

7

These include: (1) designing and constructing "erosion and sediment control measures, as laid out in its County-approved erosion and sediment control plan, to prevent off-site sedimentation damage"; (2) maintaining "a sufficient buffer to retain visible sedimentation"; (3) installing "ground stabilization measures"; (4) installing and maintaining "all temporary and permanent erosion and sediment control measures as required by General Permit NCG01 and the erosion and sediment control plan"; and (5) taking "all reasonable steps to minimize or prevent any discharge in violation of [General Permit NCG01] which has a reasonable likelihood of adversely affecting human health or the environment." (Id. ¶¶ 105, 107, 109, 111, 113.) Sound Rivers alleges Clayton has violated each of these obligations. (Id. ¶¶ 106, 108, 110, 112, 114.) In support, Sounds Rivers points to the findings of inspections by a third-party inspector and Durham County between February 7, 2022, and May 12, 2023, which revealed turbid water flowing from Sweetbrier and failures of Clayton's erosion and sediment control measures, such as diversion ditches, berms, rip rap, and others. (Id. ¶¶ 57-68, 105-114.)

Third, Sound Rivers alleges that General Permit NCG01 "compels Clayton to conduct self-inspections and record and report (1) visible sediment deposition in a stream or wetland, (2) unanticipated bypasses, and (3) any noncompliance with General Permit NCG01 that may endanger health or the environment." (Id.

8

¶ 117.)  Under the permit, Clayton must conduct inspections weekly and after eighteen qualifying storms over the relevant time period. (Id. ¶ 118.)  Sound Rivers alleges that Clayton did not report "visible sediment being deposited in on- or off-site streams, unanticipated bypasses, or other instances of noncompliance that harm the environment."  (Id. ¶¶ 119; see also id. ¶ 80 (alleging that the North Carolina Division of Energy, Mineral and Land Resources ("DEMLR") and Durham County have confirmed that they "do not possess records documenting Clayton's compliance with its reporting obligations").)

In reliance on these allegations, Sound Rivers pleads three claims for relief — each alleging violations of sections 301 and 402 of the Clean Water Act through violations of Clayton's NPDES permit obligations.  Sound Rivers seeks declaratory relief; an injunction ordering that Clayton cease ongoing violations, remove sediment pollution, restore and remediate the waters at issue, and take all necessary steps to comply with the Clean Water Act; civil penalties up to $64,618 per day per violation of the Clean Water Act; and attorneys' fees and costs.  (Id. at 33.)

On January 11, 2024, Clayton moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6). (Doc. 20.)  The motion has been fully briefed and is ready for resolution.

## II. ANALYSIS

### A. Standing

Before turning to Clayton's Rule 12(b)(6) motion, the court must first address the Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. Clayton specifically asserts that Sound Rivers lacks standing to seek the requested relief. (Doc. 21 at 4.)

#### 1. Standard of Review

"No lawsuit may proceed in federal court unless the party seeking relief has Article III standing." Carolina Youth Action Project v. Wilson, 60 F.4th 770, 778 (4th Cir. 2023). The basic standing requirements that a plaintiff must show are: (1) he has suffered an "injury in fact," (2) the injury is "fairly . . . trace[able] to the challenged action of the defendant," and (3) it is "likely" that "the injury will be redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992) (citations and internal quotation marks omitted) (alteration and omission in original); Food & Drug Admin. v. All. for Hippocratic Med., Nos. 23-235, 23-236, -- S. Ct. --, 2024 WL 2964140, at *6 (U.S. June 13, 2024).

The injury in fact "requirement ensures that plaintiffs have a 'personal stake in the outcome of the controversy.'" Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). An injury in fact is "'an invasion of

10

a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016) (quoting Lujan, 504 U.S. at 560).

An organizational plaintiff can satisfy the standing requirements in two ways: either injury in its own right, or injury as a representative of its members. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023). To represent its members, as Sound Rivers contends it does here, the organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Students for Fair Admissions, 600 U.S. at 199 (quoting Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977)).

The Fourth Circuit has observed that the standing inquiry in environmental cases is "necessary to filter the truly afflicted from the abstractly distressed." Friends of the Earth v. Gaston Copper Recycling, 204 F.3d 149, 154 (4th Cir. 2000) (en banc) ("Gaston I"); see also Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 473 (1982) (noting that without standing, federal lawsuits would be

11

"no more than a vehicle for the vindication of the value interests of concerned bystanders" (internal quotation marks and citation omitted)). Nevertheless, "an identifiable trifle will suffice." Gaston I, 204 F.3d at 156 (quoting Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 557 (5th Cir. 1996)). As such, the Supreme Court has recognized that "aesthetic, conservational, and recreational as well as economic values" may supply Article III injury, so long as "the party seeking review [] ha[s] suffered an injury." Sierra Club v. Morton, 405 U.S. 727, 738 (1972) (internal quotation marks omitted); see also Gaston I, 204 F.3d at 154 (listing as examples of injury in environmental cases, "traditional trespass on property or tortious injury to a person," or "damages [] to an individual's aesthetic or recreational interests").

Under the Clean Water Act, a citizen may "commence a civil action on his own behalf against any person . . . who is alleged to be in violation of an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a). Statutory standing under the Act has been interpreted to be coextensive with Article III standing. Gaston I, 204 F.3d at 152 (citing 33 U.S.C. § 1365(g); Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 16 (1981)).

### 2. Clayton's Motion

Clayton argues that Sound Rivers has failed to identify a nexus between any of its members and the waters claimed to be

environmentally impaired. (Doc. 21 at 9.) As to member Moira Smullen, Clayton contends that Sound Rivers "does not specify how Ms. Smullen presently uses the allegedly affected waters for aesthetic or recreational enjoyment, how frequently she uses it, or the nature or type of planned use." (Id. at 11 (internal quotation marks and brackets omitted).)

In response, Sound Rivers points to Smullen's declaration attached to the complaint (Doc. 14-4) as providing sufficient injury and traceability. (Doc. 22 at 13-14.) Smullen states that "Lick Creek and its tributaries have been part of the fabric of [her] life" for more than 30 years. (Doc. 14-4 ¶ 4.) She notes that her now-adult children used to spend "countless hours exploring and playing in [Martin Branch]." (Id.) She states that Martin Branch flows past Sweetbrier before "forming the northern boundary of [her] property." (Id. ¶ 7.)

Over the past two years, Smullen has "observed that Martin Branch, which [she] can see from [her] yard [], frequently appears muddy and red," and that at times, "there is so much dirt in the stream that it looks like it's running with blood instead of water." (Id. ¶ 8.) She has "noticed much more discoloration of Martin Branch" during the development of Sweetbrier. (Id. ¶ 9.) Smullen states that "[s]eeing Martin Branch regularly filled with dirt diminishes [her] enjoyment of the natural area surrounding [her] property" and that she is "concerned that the pollution in

13

Martin Branch is harming wildlife . . . that [she] enjoy[s] observing, as well as the balance of the larger ecosystem [she] enjoy[s] around [her] home." (Id. ¶ 13.)

Smullen would have a concrete injury traceable to Clayton's alleged conduct, had she herself sued Clayton. Contrary to Clayton's contention that Sound Rivers has not alleged how Smullen "uses the affected waters for aesthetic or recreational enjoyment," Smullen's declaration expressly states that the changes in the river that are allegedly tied to Clayton's development of Sweetbrier have diminished her enjoyment of her adjacent residential property. (Doc. 14-4 ¶¶ 12-13.)

Clayton's reliance on Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 629 F.3d 387 (4th Cir. 2011) ("Gaston II"), is unavailing. (Doc. 21 at 8.) While the plaintiffs there had canoed and kayaked on the water in question and had decreased their frequency of trips on the river due to pollution, Gaston II, 629 F.3d at 397, Smullen alleges an injury — harm to her enjoyment of the natural area and wildlife around her property, as a resident who observes the Martin Branch from her own yard — that is at least an "identifiable trifle," even if it is somewhat different in kind from that alleged in Gaston II. See Lujan, 504 U.S. at 562-63 ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); Laidlaw, 528 U.S. at 183 ("We have held that

14

environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." (citing Sierra Club, 405 U.S. at 735)); Ecological Rights Found. v. Pac. Lumber Co., 230 F.3d 1141, 1149-50 (9th Cir. 2000) (discussing that aesthetic and recreational use varies from person-to-person and rejecting a "mechanistic" approach to environmental injury)).

Further, Smullen clearly has a "direct nexus" to the "area of environmental impairment," as she alleges that she lives across the street from Sweetbrier and can see the affected water from her yard. Gaston II, 629 F.3d at 395 (not stating that a "direct nexus" is required, but that if one exists, then there is no need for evidence of actual harm to the environment to establish injury-in-fact); (Doc. 14-4 ¶¶ 7-8.) Moreover, Smullen's alleged injuries are fairly traceable to Clayton's alleged conduct and would be redressable by the requested relief. Lujan, 504 U.S. at 560-61; (Doc. 14-4 ¶ 9.) Additionally, Clayton's position that Smullen's "redressable interests" are limited to the area around her property, and thus do not extend to Lick Creek and Falls Lake (Doc. 23 at 4), is unsupported by any case law. It also fails to address the complaint's photographs that, as Plaintiffs allege, appear to show pollution from the area of Smullen's property reaching Martin Branch's confluence with Lick Creek (left, Doc. 14 ¶ 72) and Falls

15

Lake (right, Doc. 14 ¶ 77):

 

Clayton's other cited cases are also inapposite. In <u>United States v. AVX Corp.</u>, 962 F.2d 108 (1st Cir. 1992) — notably a pre-<u>Laidlaw</u> decision — the court held that an association did not have standing because its "members [we]re unidentified; their places of abode [we]re not stated; [and] the extent and frequency of any individual use of the affected resources [was] left open to surmise." <u>AVX Corp.</u>, 962 F.2d at 117; <u>see also</u> <u>Gaston I</u>, at 164 (Niemeyer, J., concurring) (describing <u>Laidlaw</u> as a "sea change in constitutional standing principles"). These facts are not present here. <u>Richardson</u> is similarly distinguishable because the plaintiffs' allegations there used "only conclusory language pertaining to the elements of standing" and did not allege a specific use of the river or a specific area of the river. <u>Richardson v. Mayor & City Council of Baltimore</u>, 13-cv-1924, 2014 WL 60211, at *4 (D. Md. Jan. 7, 2014).

Clayton contests the standing of other members of Sound Rivers, but the court need only ascertain that "at least one of

16

its members" would have standing in order for Sound Rivers to sue as an association. Gaston I, 204 F.3d at 155; Retail Indus. Leaders Ass'n v. Fielder, 475 F.3d 180, 187-88 (4th Cir. 2007) (finding associational standing after concluding one member would have standing). Further, Clayton does not contest that the interests Sound Rivers seeks to protect are germane to its purpose. Students for Fair Admissions, Inc., 600 U.S. at 199. This prong is clearly satisfied. (Doc. 14 ¶ 13 (alleging that "Sound Rivers works to protect, restore, and preserve the Neuse and Tar-Pamlico River Basins through public education, advocacy, and pollution prevention").) Similarly, Clayton does not argue that the claim asserted or the relief requested requires the participation of individual members, and the court is satisfied that their participation is not required here.[3] Students for Fair Admissions, Inc., 600 U.S. at 199. In sum, Sound Rivers has established standing at this stage.

---

[3] Clayton appears to reference this prong in a footnote in its reply, but it is unclear that it actually takes the position that the members' participation is required. (Doc. 23 at 4 n.1 (stating that "these member's [sic] purported injuries define the remedy sought and therefore the scope, scale, and direction of any future litigation efforts" but not actually arguing that their participation is required).) Associations frequently litigate Clean Water Act claims on behalf of members, and Clayton has not shown why this litigation is distinguishable. See, e.g., Congaree Riverkeeper, Inc. v. Carolina Water Serv., Inc., 248 F. Supp. 3d 733, 746 (D.S.C. 2017).

17

## B.   Failure to State a Claim

### 1.   Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. (8)(a)(2).  A Rule 12(b)(6) motion to dismiss is meant to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).  However, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."  Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008).  Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to

18

"nudge[] the[] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570; see Iqbal, 556 U.S. at 678. Thus, mere legal conclusions should not be accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

### 2. Clayton's Motion

Clayton argues that Sound Rivers's first and third claims fail to state a claim. (Doc. 21 at 17, 24.) In a footnote, Clayton states that Sound Rivers's second claim fails for lack of standing but otherwise does not argue for dismissal under Rule 12(b)(6). (Id. at 24 n.13.)[4]

Sound Rivers's first claim for relief alleges that Clayton has violated its NPDES permit obligations by causing or contributing to "violations of North Carolina water quality standards" — namely, (1) turbidity, (2) biological integrity, and (3) settleable solids. (Doc. 14 ¶¶ 82-104); see supra note 2 (stating contents of these standards). As to this claim, Clayton

---

[4] Clayton also states in a footnote that it found "no factual allegations to support an inference that any allegedly affected streams or wetlands meet the new requirements for jurisdictional waters under Sackett v. EPA, [598 U.S. 651] (2023)." (Doc. 21 at 25 n.15.) It is unclear on what grounds Clayton makes this observation, as the complaint alleges that the waters at issue are "perennial." (Doc. 14 ¶ 52); Sackett, 598 U.S. at 678 (describing "water[s] of the United States" as "relatively permanent, standing or continuously flowing bodies of water forming geographical features that are described in ordinary parlance as streams, oceans, rivers, and lakes" (internal quotation marks and brackets omitted).

19

contests that Sound Rivers has sufficiently alleged violations of North Carolina water quality standards. (Doc. 21 at 17.) Clayton contends that Sound Rivers failed to allege "natural background conditions" from before Sweetbrier's development to establish a turbidity violation and did not allege facts to undo the presumption of compliance attendant to the employment of Best Management Practices ("BMP"). (Id. at 18-20 (citing 15A NCAC 02B .0211(21) (providing for BMP compliance presumption)).) Clayton also contends that Sound Rivers did not allege several other baselines regarding the biological integrity of the waters at issue. (Id. at 22.) Similarly, Clayton argues that Sound Rivers did not allege "facts like fish kills, specific aquatic organism population declines, fewer birds, or fewer otters" to show that Clayton has violated settleable solids standards. (Id. at 23-24.)[5]

As Sound Rivers argues (Doc. 22 at 19-26), however, accepting Clayton's contentions would impermissibly require the court to resolve fact questions in its favor. Clayton has supplied no authority to support requiring Sound Rivers to allege the actual background conditions before the alleged polluting activity

---

[5] Clayton also argues that "there are no allegations that Falls Lake, one of the allegedly impacted waters, is in violation of the turbidity standard or has even been tested," which in its view requires "this aspect of the action [to] be dismissed." (Doc. 21 at 17-18.) It is unclear, however, what "aspect" Clayton seeks to dismiss. (See also Doc. 14 ¶ 77 (alleging photographs of discoloration in Falls Lake due to sediment from Lick Creek).)

commenced. Moreover, it is plausible that turbidity levels have exceeded natural background conditions based on Sound Rivers's allegation that its measuring device for turbidity hit its maximum observable unit on one occasion. (Doc. 14 ¶ 70.) Further, Plaintiffs have alleged that nearby Rocky Branch, which does not flow past Sweetbrier, had an NTU "near or under" 50. (Id. ¶ 94.) While Clayton dismisses this allegation — without citation to any legal authority — because Rocky Branch is a "wholly unrelated stream," Rocky Branch's lower NTU is some support for the plausibility of Sound Rivers's claim. (Doc. 21 at 19 n.7.) In addition, Clayton's reliance on BMP measures as a *per se* shield likewise requires further fact determinations. In fact, the complaint does not even allege that Clayton implemented BMPs. (Id. ¶ 95 (stating only that "violations of the numeric turbidity standard cannot be excused by any employment of best management practices")); see also New Manchester Resort & Golf, LLC v. Douglasville Dev., LLC, 734 F. Supp. 2d 1326, 1339 (N.D. Ga. 2010) (finding disputed issue of fact regarding maintenance of BMPs, while noting that "proof of [BMPs] is essentially an affirmative defense").

Clayton's characterization of the biological integrity standards allegations as conclusory and repetitive of regulatory requirements is also unsupported. Sound Rivers has alleged that sediment pollution harms aquatic ecosystems, including by

21

degrading water quality and habitats, and that Clayton has contributed to sediment pollution in Martin Branch, Hurricane Creek, and Lick Creek. (Doc. 14 ¶¶ 3-4, 37-38, 69-77, 97-98.) Similarly, Sound Rivers's allegations regarding settleable solids standards are plausible in light of the complaint's assertions that sediment pollution negatively impacts aquatic ecosystems and drinking water sources, and that Clayton has contributed to sediment pollution in the waters at issue. (Id. ¶¶ 3-4, 38, 50, 69-73, 77, 101.) While Clayton suggests several more specific allegations Sound Rivers could have made, but did not, it offers no legal authority for requiring these allegations at this stage. (Doc. 21 at 22 (arguing that Clayton did not allege, for example, "a reduction of the number of fish, crawfish, water-bugs, algae, turtles, etc.").)[6] Accordingly, Clayton has not shown that it is entitled to dismissal of claim one.

Sound Rivers's third claim for relief alleges that Clayton failed to comply with its reporting obligations under its NPDES permit. (Id. ¶¶ 117-121.) According to Sound Rivers, Clayton must, but failed to, report instances of (1) visible sediment deposition in a stream or wetland, (2) unanticipated bypasses, and (3) any noncompliance with General Permit NCG01 that may endanger

---

[6] Clayton's citation to the State's standard for determining biological integrity for the issuance of a permit, based on factual findings, is misplaced in this pleading context. (See Doc. 21 at 21 (citing Sound Rivers, Inc. v. N.C. Dep't of Env't Quality, 891 S.E.2d 83, 86 (N.C. 2023)).)

22

health or the environment. (Id. ¶ 117-19.) As to this claim, Clayton argues that the complaint is "devoid of any allegation that [it] knew of the conditions that are alleged to have required reporting under General Permit NCG01." (Doc. 21 at 24.) It also contends that there is no allegation that Clayton did not inspect Sweetbrier or that Clayton performed the inspections and found reportable events but failed to report them. (Id. at 25.) In Clayton's view, Sound Rivers's allegations thus rely on unwarranted inferences. (Id. at 26.) In response, Sound Rivers argues that the Clean Water Act does not require alleging or even proving knowledge. (Doc. 22 at 26 (citing Stoddard v. W. Carolina Reg'l Sewer Auth., 784 F.2d 1200, 1208 (4th Cir. 1986)).) Sound Rivers additionally contends that Clayton's remaining arguments simply contest factual allegations, which must be accepted as true at this pleading stage. (Id. at 27-28.)

Sound Rivers is correct that the Clean Water Act is a strict liability regime. Am. Canoe Ass'n v. Murphy Farms, 412 F.3d 536, 540 (4th Cir. 2005). Accordingly, failure to plead a knowing violation is not fatal to the complaint. Similarly, Sound Rivers is correct that, accepting its allegations as true, it has plausibly alleged violations of the Clean Water Act's reporting requirements. Contrary to Clayton's argument, Sound Rivers did allege that Clayton failed to report occurrences that require reporting under its NPDES permit. (Doc. 14 ¶ 119 ("While Clayton

23

had coverage under General Permit NCG01 and was discharging sediment into the surrounding waterways, it failed to report instances of visible sediment being deposited in on- or off-site streams, unanticipated bypasses, or other instances of noncompliance that harm the environment."); see also id. ¶¶ 72-77 (photographs showing turbid and/or muddy water), 80 (alleging that DEMLR and Durham County do not have records of Clayton reporting violations); (Doc. 14-4 ¶ 8 (Smullen stating that she could see turbidity from her property).) Accordingly, Sounds Rivers has plausibly alleged a violation of Clayton's reporting obligations.

**III. CONCLUSION**

For the reasons stated, therefore,

IT IS ORDERED that Clayton's motion to dismiss (Doc. 20) is DENIED.


                                              /s/   Thomas D. Schroeder
                                       United States District Judge
June 28, 2024

24